[Civ. No. 11719.   Second Appellate District, Division Two.—November 21, 1938.]

In the Matter of the Adoption of FREDERICK CECIL BARTHOLOMEW, a Minor.   CECIL LLEWELYN BARTHOLOMEW et al., Appellants, v. MILLICENT MARY BARTHOLOMEW, Respondent.

Avery M. Blount, Betty B. Gillette and M. S. Meyberg for Appellants.

Neblett, Warner & MacDonald and E. Walter Guthrie for Respondents.

WOOD, J.—By an order made in the superior court on April 3, 1937, Frederick Cecil Bartholomew was adopted by Millicent M. Bartholomew. An application was made on September 27, 1937, by Cecil L. Bartholomew and Lilian M. Bartholomew, the natural parents of Frederick, asking the court to cancel and revoke its order of adoption upon the grounds that the order was brought about by means of fraud practiced upon the applicants and that the applicants are entitled to relief on account of their mistake, inadvertence, surprise and excusable neglect. From an order denying their application Mr. and Mrs. Bartholomew prosecute this appeal. The appellants noticed their motion for hearing on October 1, 1937. The motion was based, in part, upon affidavits "to be hereafter served". No affidavits were filed until October 29, 1937. No point is made in the briefs concerning the failure of appellants to file affidavits within the period of six months from the making of the order of adoption and we will therefore consider the matter on the merits.

From the affidavits presented by the appellants it appears that Frederick's father, Cecil L. Bartholomew, whom for brevity and clarity we shall hereinafter refer to as Cecil, was a disabled war veteran. Frederick was born February 8, 1924, and the appellants had two other minor children older than Frederick. The family lived in a factory district of London, England. When Frederick was three and one-half years of age smoke and fog prevalent in the district of the family residence affected Frederick's health to such an extent that physicians advised that it was necessary for him to live in a different atmosphere. Accordingly Cecil made arrangements with his own parents to care for Frederick in their home in Warminster, a town eighty miles from London. While Frederick was with his grandparents Cecil paid for his board, clothing and schooling. At that time Cecil's sister, Millicent Bartholomew, whom for brevity and clarity we shall hereinafter refer to as Millicent, was living with her parents and doing general housework at the home, there being no servants. It fell to her lot to have general care of Frederick. Early in Frederick's life he showed evidence of dramatic talent and upon Millicent's offer to supervise his education Cecil entered into an agreement with her whereby she was to manage Frederick's theatrical efforts during his minority and would receive a stipulated compensation for her services.

It further appears from the affidavits that in the spring of 1934 Millicent represented to Cecil that it would be better to take Frederick to America and her request for permission to take him to America for a vacation of sixty days was granted. On July 15, 1934, Cecil received a letter from Frederick's grandfather informing him that Millicent had sailed for America with the child and would return in sixty days; that the child was outfitted for the trip and the bills thereafter sent to appellants. Before leaving England Millicent had made arrangments for Frederick to work in the picture "David Copperfield" and upon arriving in America she went directly to Hollywood with Frederick. She did not inform appellants that arrangements for this picture had already been made before leaving England. Although Frederick had frequently written letters to members of his family before he left England, no letters were received from him after his arrival in America notwithstanding his parents frequently wrote to him.

An order appointing Millicent guardian of the person and estate of Frederick was made in the superior court on October 22, 1935, without the consent of appellants. In June, 1936, Cecil succeeded in obtaining funds and came to America. Thereupon a compromise agreement was entered into between the parties concerned by which it was provided that Millicent would remain as guardian of the person of the minor and the Union Bank & Trust Company be appointed guardian of his estate; that Millicent would receive $800 per month for the maintenance of herself and the minor and that of the remainder 80 per cent would be held in trust for Frederick until his majority, 10 per cent would go to Frederick's two sisters and 10 per cent to his father. This agreement was made an order of the court in the guardianship proceedings. Cecil returned to England but shortly thereafter received, a cablegram from his own father, who was then living with Millicent in Los Angeles, informing him that Frederick was threatened with kidnaping and Cecil again came to Los Angeles. Millicent informed him that certain legal matters involving his finances in England would react against Frederick and would endanger his career and suggested that appellants should give their consent to his adoption by her. Cecil consented to the adoption provided it could be voided

in the future if appellants should feel it was for Frederick's best interests.

On December 3, 1936, Cecil and Millicent went to the office of Millicent's attorney where a document was prepared for the adoption of Frederick by Millicent. Cecil signed his consent to the adoption, but as a condition of signing the document he required and received from Millicent a letter in which it was stated that "upon six months written notice from either of us to the other, said consent may be cancelled and withdrawn; it being understood that said six months period shall commence and start to run on and after the completion of all legal proceedings to complete said adoption by me".

Cecil returned to London and on December 21, 1936, he and his wife, Lilian, signed other and different consents to the adoption of Frederick by Millicent, each giving his and her " full and free consent to the adoption of said child by Myllicent Bartholomew . . . it being fully understood by me that I am giving up all of my right of custody, services and earnings of said child and that said child cannot be reclaimed by me". On December 30, 1936, Cecil wrote Millicent, in part: "With regard to the letter you want me to return, I have explained this to Lilly and once we get the first part of this tangle straightened out I will return it to you." Cecil referred to the letter from Millicent in which she agreed that the consent to the adoption could be withdrawn.

A petition for the adoption of Frederick was filed by Millicent on February 8, 1937, to which were attached the consents signed by appellants on December 23, 1936. On March 6, 1937, an official of the California department of social welfare, in accordance with his duty, wrote separate letters to each of the appellants asking their reasons why they felt the adoption to be desirable. Each appellant wrote to the department of social welfare giving reasons for consenting to the adoption and showing that they understood the full purport of the proceedings. Upon receiving these letters the department of social welfare recommended to the court that the petition for adoption be granted.

Appellants complain of the actions of Millicent shortly after the order of adoption was made, set forth in the affidavits, whereby she took legal steps to set aside the stipulations which had been entered into concerning the disposition of Frederick's earnings, approximately $100,000 per year since April,

1937, and to remove the Union Bank & Trust Company as guardian of Frederick's estate. It is claimed by appellants that Millicent has schemed to secure all of the minor's earnings for herself. No affidavits were filed in opposition to the affidavits presented by appellants and substantially all of the matters set forth therein are uncontradicted. Millicent admitted as a witness that at the time she signed the letter of December 3, 1936, she had no intention of permitting the cancellation of the order of adoption.

Although the foregoing summary is not entirely complete, it sufficiently presents the facts before the trial court for the purposes of this appeal. Much can be said in favor of the contentions of each of the parties and counsel have filed persuasive briefs in favor of their respective clients. In behalf of appellants it is urged that they acted only in the interests of their minor child and under the belief that they could have the adoption order set aside if they should consider that the interests of the child called for such action. On the other hand it is urged on behalf of the adoptive mother that the appellants, by the letter of December 30, 1936, agreed to forego the right given them in the letter of December 3d, concerning the cancellation of their consent to the adoption; and that they freely and unreservedly gave their consent to the adoption with complete information concerning its purport.

It is manifest that the application to vacate the order of adoption was made in the lower court under the provisions of section 473 of the Code of Civil Procedure, the only remedy open to the applicants in this proceeding. No rule of law is better established than the rule that an application under this section of the code is directed to the sound discretion of the trial judge and that the order of the trial judge should not be disturbed on appeal unless it be made clearly to appear that such discretion was abused. All presumptions must be indulged in favor of the action of the trial court and the burden is upon appellants to show an abuse of discretion. (*Moore* v. *Thompson,* 138 Cal. 23 [70 Pac. 930]; *Winchester* v. *Black,* 134 Cal. 125 [66 Pac. 197].) The application under consideration was presented to the same judge who made the original order of adoption. In denying the application the judge pointed out that it was the wish of the minor to have the adoption order remain in force; and that in his judg-

ment the best interests of the child would be served by a denial of the application. We find no abuse of discretion on the part of the trial court.

The order is affirmed.

Crail, P. J., concurred.

McCOMB, J., Concurring.—I concur in the result reached by the majority opinion in addition to the reasons stated therein because the trial court was without jurisdiction to hear the motion from which the appeal is taken. The motion was made more than six months after the date of the order which was the subject of attack and hence too late. (Code Civ. Proc., sec. 473; *Brownell* v. *Superior Court*, 157 Cal. 703, 710 [109 Pac. 91]; *Estate of Hunter*, 99 Cal. App. 191, 196 [278 Pac. 485].)

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 19, 1939.